UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF WISCONSIN

In re:                                    )
                                          )
                                          )   Case No.: 20-27329
Iola Living Assistance, Inc.,             )
                                          )   Chapter 11
                  Debtor.                 )
                                          )

## OBJECTION OF FIRST STATE BANK TO
## DEBTOR'S PLAN OF REORGANIZATION DATED MARCH 18, 2021

NOW COMES First State Bank (the "Bank"), by its attorneys, Davis & Kuelthau, s.c., and as and for its objection to the Debtor's Plan of Reorganization dated March 18, 2021 (the "Plan"), alleges and shows to the court as follows:

### INTRODUCTION

The Debtor's "partial debt for dirt" plan unfairly shifts the risks and costs associated with selling the property to the Bank. Moreover, under the Plan, if the sale of the property to be surrendered does not net the amount of the proposed credit, the Bank has no recourse to its remaining collateral from which to satisfy the deficiency. As such, the Plan does not provide the Bank with the "indubitable equivalent" of the Bank's claim and cannot be confirmed in accordance with 11 U.S.C. § 1129(b)(2)(A)(iii).

Russell S. Long
Davis & Kuelthau, s.c.
111 East Kilbourn, Ste. 1400
Milwaukee, WI 53202
Phone: 414-225-1456; Fax 414-278-3656

## STATEMENT OF FACTS

The Bank is owed approximately $5.6 million, plus attorneys' fees. The Debtor values the Bank's collateral at approximately $6.645 million. (*Plan*, Ex. 1) The Bank's fully secured claim, therefore, includes a significant equity cushion. The Bank's claim primarily is secured by the two assisted living facilities: Living Oaks and the Willows. The Debtor's appraiser valued these two facilities at $5.190 million. (*Id.*) Notwithstanding this valuation, the Plan proposes to reduce the Bank's secured claim on the Living Oaks and the Willows to $4.220 million, to pay interest only on this amount for a year, and proposes a credit of $1.380 million. (*Plan*, p. 10, class 2) The basis of the credit is the surrender of certain properties valued in the Plan as follows:

- Butternut Ridge        $750,000.00
- Vacant Nursing Home    $565,000.00
- Undeveloped Land       $  60,000.00
             TOTAL:      $1,375,000.00

(*Plan*, Ex. 1) The valuation in the Plan, however, does not take into account the following:

- The risk to the Bank of substantial delay in selling the properties;
- Holding costs, including management and maintenance of the properties and real estate taxes;
- Costs of marketing the properties; and
- Costs of sale.

## DISCUSSION

In accordance with § 1129(b), a Chapter 11 plan cannot be confirmed over the objection of a secured creditor unless it "does not discriminate unfairly" and is "fair and equitable" to the creditor.

Russell S. Long
Davis & Kuelthau, s.c.
111 East Kilbourn, Ste. 1400
Milwaukee, WI 53202
Phone: 414-225-1456; Fax 414-278-3656

A plan is "fair and equitable" if it provides:

>  (i) the secured creditor's retention of its liens and the receipt of deferred cash payments equal to the value of its claim;
>
> (ii) the sale, subject to the secured creditor's right to credit bid, of its collateral with its lien to attach to the proceeds; or
>
> (iii) the realization by the secured creditor of the "indubitable equivalent" of its claim.

11 U.S.C. § 1129(b)(2)(A).

The Bankruptcy Code does not define "indubitable equivalent;" however, courts interpreting this term, first used by Judge Learned Hand in *In re Murel Holding Corp.*, 75 F.2d 941 (2d Cir. 1935), hold that "'indubitable' means too evident to be doubted." *See In re Walat Farms Inc.*, 70 B.R. 330, 334 (Bankr. E.D. Mich. 1987) citing Webster's Ninth New Collegiate Dictionary (1985). "The bar for a finding of indubitable equivalence is exceedingly high," and "there must be no doubt that the secured creditor receives consideration equal to its claim in value or amount." *In re Bannerman Holdings, LLC*, No. 7:11-CV-00009-H, *4-5, 2011 BL 437136, 2011 US Dist Lexis 153502 (E.D.N.C. Sept. 30, 2011) (citation omitted). The decision to confirm a dirt for debt or partial dirt for debt plan "must be so conservatively or sparingly applied as to ensure that the lender forced over its objection to accept property in satisfaction of a claim receives the indubitable equivalent of cash." *In re Investors Lending Grp.*, 489 B.R. 307, 314 (Bankr. S.D. Ga. 2013) (citations omitted). Importantly, the debtor bears the burden to show that the indubitable equivalent requirement is met. *In re Arnold Baker Farms*, 177 B.R. 648, 662 (B.A.P. 9th Cir. 1994).

Shifting risk to the secured creditor, including significant holding costs relating to real estate taxes, maintenance and the marketing of the property for sale, is not an indubitable

Russell S. Long
Davis & Kuelthau, s.c.
111 East Kilbourn, Ste. 1400
Milwaukee, WI  53202
Phone:  414-225-1456; Fax 414-278-3656

3

equivalent. *In re CRB Partners, LLC*, Nos. 11–11924–CAG, 11–11915–CAG, 11–11924, 2013 WL 796566 (Bankr. W.D. Tex. Mar. 4, 2013). Where a lengthy realization process threatens to ensue, even a substantial margin may not make property proposed in satisfaction of debt its indubitable equivalent. *In re Cottonwood Corners Phase V, LLC*, No. 11–11–12663 JA, 2012 WL 566426 (Bankr. D.N.M. Feb. 17, 2012). This is particularly true when the debtor itself has had trouble selling the asset. *In re SUD Properties, Inc.*, No. 11-03833-8-RDD, 2011 WL 5909648 (Bankr. E.D.N.C. Aug. 23, 2011).

A 2020 decision from the Bankruptcy Appellate Panel of the Ninth Circuit illustrates the application of this standard and why the Debtor's plan cannot be confirmed. In *In re Fleming*, No. 6:17-BK-19513-MW, 2020 WL 1170722 (B.A.P. 9th Cir. Mar. 10, 2020), the bankruptcy court approved a partial dirt for debt plan over the lender's objection. The lender was owed $4.7 million. The debtor's plan provided for an effective date payment of $500,000, the transfer of certain real estate to the lender it valued at $3,753,100, with the balance to be paid with interest over 5 years. The plan also stated that the exact amount of the credit to be applied would be determined by the court. After an evidentiary hearing, the bankruptcy court determined that the value of the property to be surrendered was $3,694,100 and confirmed the plan. Although the Bankruptcy Appellate Panel did not take issue with the bankruptcy court's valuation, it reversed confirmation on the grounds that the plan did not ensure full payment of the secured claim, holding that "it does not provide compensation for the necessary time to sell the [property] and it unfairly shifts the risk of selling the [property] to the [lender]." *In re Fleming*, 2020 WL 1170722, *6.

Russell S. Long
Davis & Kuelthau, s.c.
111 East Kilbourn, Ste. 1400
Milwaukee, WI 53202
Phone: 414-225-1456; Fax 414-278-3656

The Bankruptcy Appellate Panel in *Fleming* based its decision on the Ninth Circuit case *In re Arnold Baker Farms*. In that case, the bankruptcy court confirmed a partial dirt for debt plan after adding an extra 10% of the property to be surrendered to the secured creditor as compensation for holding costs and costs of sale. The Bankruptcy Appellate Panel and the Ninth Circuit reversed, even with the 10% add-on, because the plan still did not insure the "safety of or prevent jeopardy to" the secured creditor's claim. *See In re Arnold Baker Farms*, 177 B.R. 648 at 662. The Ninth Circuit held that the plan was not confirmable because if the property sold for less than the value determined by the bankruptcy court, the secured creditor would have "no recourse to the remaining collateral to satisfy the deficiency." *Id.*

So too here, although the Debtor's plan provides for there to be nearly $1 million in equity in the Living Oaks and the Willows post-confirmation, the Bank has no recourse to this collateral if the net proceeds of the sale of the properties proposed to be surrendered is less than the amount of the credit contained in the Plan.

Moreover, it is not "too evident to be doubted" that the Bank would net the amount identified in the Plan from the sale of the vacant nursing home, the twelve-unit apartment building attached thereto, and the vacant lots. The vacant nursing home has been closed for over a year. There is no current market for such a facility in Iola. When holding costs and potential demolition costs are taken into consideration, the skilled nursing facility may have no value. The precedent cited above requires the court not to confirm the Plan.

## **CONCLUSION**

As set forth herein, the Debtor's plan does not meet the indubitable equivalent standard of 11 U. S. C. § 1129(b)(2)(A)(iii) and, therefore, cannot be confirmed over the Bank's objection.

Russell S. Long
Davis & Kuelthau, s.c.
111 East Kilbourn, Ste. 1400
Milwaukee, WI 53202
Phone: 414-225-1456; Fax 414-278-3656

5

Dated: April 23, 2021.　　　　　　　　　　　　s/Russell S. Long
　　　　　　　　　　　　　　　　　　　　　　Russell S. Long (WI Bar No. 1008602)
　　　　　　　　　　　　　　　　　　　　　　Attorneys for First State Bank
　　　　　　　　　　　　　　　　　　　　　　Davis & Kuelthau, s.c.
　　　　　　　　　　　　　　　　　　　　　　111 E. Kilbourn Avenue, Suite 1400
　　　　　　　　　　　　　　　　　　　　　　Milwaukee, WI 53202
　　　　　　　　　　　　　　　　　　　　　　Telephone: 414.225.1456
　　　　　　　　　　　　　　　　　　　　　　Fax: 414.278.3656
　　　　　　　　　　　　　　　　　　　　　　Email: rlong@dkattorneys.com

Russell S. Long
Davis & Kuelthau, s.c.
111 East Kilbourn, Ste. 1400
Milwaukee, WI 53202
Phone: 414-225-1456; Fax 414-278-3656

6

SunTrust Bank v. Bannerman Holdings, LLC (In re Bannerman Holdings, LLC), No. 7:11-CV-00009-H, 2011 BL 437136, 2011 Us Dist Lexis 153502 (E.D.N.C. Sept. 30, 2011), Court Opinion

**Pagination**

\*     BL

Majority Opinion >

UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF NORTH CAROLINA, SOUTHERN DIVISION

IN RE: BANNERMAN HOLDINGS, LLC, Debtor. SUNTRUST BANK, Appellant, v. BANNERMAN HOLDINGS, LLC, Appellee.

No. 7:11-CV-00009-H

September 30, 2011, Filed

September 30, 2011, Decided

ON APPEAL FROM THE UNITED STATES BANKRUPTCY COURT FOR THE EASTERN DISTRICT OF NORTH CAROLINA, WILSON DIVISION.

For SunTrust Bank, Appellant: Brian David Darer, LEAD ATTORNEY, Parker, Poe, Adams & Bernstein, Raleigh, NC.

For Bannerman Holdings, LLC, Appellee: George Mason Oliver, LEAD ATTORNEY, Oliver Friesen Cheek PLLC, New Bern, NC.

MALCOLM J. HOWARD, Senior United States District Judge.

MALCOLM J. HOWARD

This matter is before the court on appeal from an order of the United States Bankruptcy Court for the Eastern District of North Carolina confirming the Debtor's Chapter 11 plan over the objection of Appellant, SunTrust

© 2021 The Bureau of National Affairs, Inc. All Rights Reserved. Terms of Service

Bloomberg Law®

Bank. The parties have thoroughly briefed the issues on appeal and the matter is now ripe for adjudication.

## BACKGROUND

Bannerman Holdings, LLC (the "Debtor" or "Bannerman"), a North Carolina Limited Liability Company located in Wilmington, North Carolina, is in the business of buying, selling, and leasing real estate. SunTrust Bank ("Appellant" or "SunTrust") is Bannerman's largest secured creditor. In 2006, SunTrust financed Bannerman's acquisition and development of Bannerman Station, a condominium development in downtown Wilmington. Bannerman executed a note in favor of SunTrust in the amount of $13,500,000.00, which was secured by a first-priority security interest in the Bannerman Station property and a parking lot (the "Parking Lot"). Bannerman was unable to pay the note in full when it matured on March 1, 2008. SunTrust provided Bannerman a two-year extension, but it ultimately remained unable to repay the note and filed a Chapter 11 bankruptcy petition on February 12, 2010.

Bannerman filed a Plan of Reorganization and subsequent modifications (collectively, the "Plan"), which proposed in pertinent part: (1) to satisfy SunTrust's claim in full by transferring to SunTrust eleven of the fifteen remaining unsold condominium units in Bannerman Station and the Parking Lot; (2) to satisfy the claims of all unsecured creditors and McKinley Building Corporation ("McKinley"), a junior lien holder, by transferring one condominium to McKinley; and (3) to retain for Bannerman three condominium units, free and clear of all liens. SunTrust objected to the Plan, and the bankruptcy court subsequently held a three-day confirmation hearing, during which the bankruptcy court heard evidence concerning the value of the condominium units. On October 20, 2010, the bankruptcy court entered an order confirming Bannerman's plan over the objection of SunTrust. The bankruptcy court concluded that the plan was fair and equitable, because the surrender of the eleven condominiums and the Parking Lot provided SunTrust with the indubitable equivalent of its claim, as contemplated by section 1129(b)(2)(A)(iii) of the Bankruptcy Code.

SunTrust sought from the bankruptcy court a stay pending appeal, which **[*2]** was denied. SunTrust then sought from this court a stay pending appeal, which was also denied. SunTrust filed a notice appealing the bankruptcy court's confirmation order on January 11, 2011. This court has jurisdiction over the appeal pursuant to 28 U.S.C. § 158(a).

## COURT'S DISCUSSION

**I. Standard of Review**

The court will not set aside any findings of fact by the bankruptcy court unless they are clearly erroneous. Fed. R. Bankr. P. 8013. "A finding of fact is clearly erroneous only when 'the reviewing court on the entire record is left with the definite and firm conviction that a mistake has been made.'" In re Reg'l Bldg. Sys., Inc., 320 F.3d 482, 485 (4th Cir. 2003) (quoting In re Morris Commc'ns, N.C., Inc., 914 F.2d 458, 467 (4th Cir. 1990)). A bankruptcy court's conclusions of law are reviewed de novo. Terry v. Meredith (In re Meredith), 527 F.3d 372, 375 (4th Cir. 2008).

The parties disagree as to the appropriate standard of review in this case. SunTrust, relying on cases outside of the Fourth Circuit, contends that the bankruptcy court's determination of whether the Plan provided it with the indubitable equivalent of its claim is a mixed question of law and fact, but that the ultimate determination of



indubitable equivalence is a question of law requiring statutory construction. See, e.g., In re Arnold & Baker Farms, 85 F.3d 1415 , 1421 (9th Cir. 1996) ("Although the value of the land is a finding of fact which we review for clear error, the ultimate conclusion of indubitable equivalence is a question of law which we review de novo because it requires analysis of the meaning of the statutory language in the context of the Bankruptcy Code's 'cram down' scheme."). Bannerman, citing no case law, contends that the indubitable equivalence determination is one of fact that turns on the value of the property.

Although there is no authority directly on point, the Fourth Circuit Court of Appeals has previously held that the determination of indubitable equivalence, albeit in the context of providing adequate protection under 11 U.S.C. § 361(3) , "is a question of fact rooted in measurements of value and the credibility of witnesses." In re Snowshoe Co., Inc., 789 F.2d 1085 , 1088 (4th Cir. 1986); see also In re James Wilson Assocs., 965 F.2d 160 , 172 (7th Cir. 1992) ("[T]he question whether the interest received by a secured creditor under a plan of reorganization is the indubitable equivalent [under 11 U.S.C. § 1129(b)(2)(A)(iii) ] of his lien is one of fact, In re Snowshoe Co., 789 F.2d 1085 , 1088 (4th Cir. 1986), and our review is therefore deferential."); In re Criimi Mae, Inc., 251 B.R. 796 , 799 (Bankr. D. Md. 2000) (noting that creditor conceded that indubitable equivalence under 11 U.S.C. § 1129(b)(2)(A)(iii) is a question of fact and citing *In re James Wilson Assocs.* and *In re Snowshoe Co.*). The court sees no reason that a different standard of review would apply to an indubitable equivalence determination based on whether it was made in the context of adequate protection or plan confirmation. That being said, the court need not decide that issue today, because even under the most deferential standard of review, the bankruptcy court's decision must be reversed.

**II. Equitable Mootness**

Bannerman argues that this appeal is equitably moot and should be dismissed without consideration of the bankruptcy court's order. SunTrust counters that equitable mootness **[*3]** does not apply in this case because the court can provide SunTrust with effective relief without disturbing the core provisions of the Plan.

"The doctrine of equitable mootness represents a pragmatic recognition by courts that reviewing a judgment may, after time has passed and the judgment has been implemented, prove 'impractical, imprudent, and therefore inequitable.'" In re U.S. Airways Group, Inc., 369 F.3d 806 , 809 (4th Cir. 2004) (quoting Mac Panel Co. v. Va. Panel Corp., 283 F.3d 622 , 625 (4th Cir. 2002)). "Within the context of a bankruptcy proceeding, a court may dismiss an appeal as equitably moot 'when it becomes impractical and imprudent to upset the plan of reorganization at this late date.'" Id . Factors to consider in determining whether an appeal is equitably moot are: "(1) whether the appellant sought and obtained a stay; (2) whether the reorganization plan or other equitable relief ordered has been substantially consummated; (3) the extent to which the relief requested on appeal would affect the success of the reorganization plan or other equitable relief granted; and (4) the extent to which the relief requested on appeal would affect the interests of third parties." Id . Having carefully considered these factors, the court concludes that this appeal is not equitably moot.

Although SunTrust failed to obtain the stay it sought, this court's decision denying that stay was based on a finding that SunTrust did not show it was likely to suffer irreparable harm absent a stay of the bankruptcy court's order. In re Bannerman Holdings, LLC, No. 5:10-cv-532-H, 2011 U.S. Dist. LEXIS 7573 , *3 (Jan. 26, 2011 Order Denying Stay at 3) [DE #15]. Bannerman had argued, in opposition to the motion for stay, that in

the event the bankruptcy court was reversed, "SunTrust will have access to $1,292,264.56 worth of the Debtor's property to satisfy its claim" because "the Debtor could transfer the three units that it retained to provide additional collateral as this Court may require." Id . (Debtor's Resp. to Stay Motion at 8-9) [DE #8]. Bannerman cannot now complain that the court is unable to provide relief to SunTrust without a complete unraveling of the Plan. The only interests that are necessarily impacted by a reversal of the bankruptcy court's order are those of Bannerman, and the relief SunTrust seeks may be granted without upsetting the Plan provisions with respect to third parties.

**III. Indubitable Equivalence**

SunTrust argues that the bankruptcy court erred (1) in concluding that the Plan provides it with the indubitable equivalent of its claim pursuant to 11 U.S.C. § 1129(b)(2)(A)(iii) ; and (2) in valuing the property. The court need not reach the second issue, because it finds the indubitable equivalence question dispositive of this appeal. See In re Arnold & Baker Farms, 85 F.3d at 1422 (concluding that bankruptcy court's valuation was not clearly erroneous, but that value of property did not provide the indubitable equivalent of the secured claim).

As the bankruptcy court correctly explained:

> Because at least one impaired class has accepted the plan, the court may confirm the plan notwithstanding SunTrust's objection if the plan does not discriminate unfairly and is **[*4]** fair and equitable to SunTrust. 11 U.S.C. § 1129(b) . A secured creditor's treatment may be deemed fair and equitable if it satisfies one of the three criteria set forth under § 1129(b)(2)(A) . The debtor contends that its treatment of SunTrust provides "for the realization by [SunTrust] of the indubitable equivalent of [its] claims." § 1129(b)(2)(A)(iii) .
>
> . . . .
>
> The focus of the inquiry in this case is whether the partial surrender of collateral proposed by the debtor grants SunTrust the indubitable equivalent of its claim. It is generally understood that when a secured creditor receives all of the property to which its lien attaches, the creditor has received the full value - the "indubitable equivalent" - of its monetary claim, because "common sense tells us that property is the indubitable equivalent of itself." Matter of Sandy Ridge Dev. Corp., 881 F.2d 1346 , 1350 (5th Cir. 1989). When a debtor's plan calls for surrender of a portion of the property in full satisfaction of the debt, however, the assessment becomes more complicated.

(Order Confirming Plan ("Conf. Order") at 5 [DE #2-38].) The bankruptcy court next undertook a thorough valuation analysis and determined that the value of the eleven condominiums and the Parking Lot Bannerman proposed to surrender to SunTrust under the Plan was $4,779,925.00. ( Id. at 7-16.) Finally, the bankruptcy court concluded that the $4,779,925.00 in proposed surrendered property provided SunTrust with the indubitable equivalent of its $4,642,660.44 claim: "The court finds that based upon what it deems to be a conservative approach to valuation and the circumstances of this case, the property to be surrendered has an 'excess value' of over $137,000, which suffices to satisfy the indubitable equivalent standard of § 1129(b)(2)(A)(iii) ." ( Id. at 16-17.) Having carefully considered the bankruptcy court's order and the evidence before it at the confirmation hearing, the court finds that the bankruptcy court's ruling was clearly erroneous.

⊞ SunTrust Bank v. Bannerman Holdings, LLC (In re Bannerman Holdings, LLC), No. 7:11-CV-00009-H, 2011 BL 437136, 2011 Us Dist Lexis 153502 (E.D.N.C. Sept. 30, 2011), Court Opinion

## A. The Test for Indubitable Equivalence

The bar for a finding of indubitable equivalence is exceedingly high:

> This burden is more than a mere preponderance of the evidence and more than even beyond a reasonable doubt, but rather the indubitable equivalence of a cash payment on the date of confirmation.
>
> The burden is akin to a clear and convincing standard.
>
> Where the creditor is earmarked to receive part of its collateral, any such plan will be subject to extremely close scrutiny to insure that the creditor will actually receive the indubitable equivalent of its secured claim.

In re Prosperity Park, LLC, No. 10-31399, 2011 Bankr. LEXIS 1852 , 2011 WL 1878210 , at *4 (Bankr. W.D.N.C. May 17, 2011) (internal citations omitted). The concept of indubitable equivalence found in the Bankruptcy Code was taken from Judge Learned Hand's opinion in In re Murel Holding Corp., 75 F.2d 941 , 942 (2d Cir. 1935). See In re Sandy Ridge Dev. Corp., 881 F.2d 1346 , 1350 (5th Cir. 1989) (citing 124 Cong. Rec. H 11089 (daily ed. September 28, 1978) (statement of Rep. Edwards), reprinted in 1978 U.S. Code Cong. & Admin. News 6436 at 6475.) Judge Hand reasoned that a judge could "equitably and fairly" provide adequate protection to an objecting creditor where the debtor declined to satisfy the **[*5]** creditor through traditional means, e.g., maintenance of the creditor's liens, sale of the collateral, or payment of the value of the liens. In re Murel Holding Corp., 75 F.2d at 942 . However, Judge Hand cautioned that "[i]n construing so vague a grant, we are to remember not only the underlying purposes of the section, but the constitutional limitations to which it must conform." Id . He further explained:

> It is plain that 'adequate protection' must be completely compensatory; and that payment ten years hence is not generally the equivalent of payment now.
>
> Interest is indeed the common measure of the difference, but a creditor who fears the safety of his principal will scarcely be content with that; he wishes to get his money or at least the property.
>
> We see no reason to suppose that the statute was intended to deprive him of that in the interest of junior holders, unless by a substitute of the most indubitable equivalence.

Id .(emphasis added). Therefore, to make a finding that a creditor has been provided with the indubitable equivalent of its claim, there must be "no doubt that the secured creditor receives consideration equal to its claim in value or amount." In re Philadelphia Newspapers, LLC, 599 F.3d 298 , 326 (3d Cir. 2010) (noting that Webster's Dictionary defines "indubitable" as "not open to question or doubt" or "too evident to be doubted"). Said another way, where there is considerable doubt as to the underlying value of the property to be surrendered, the risk that the creditor will not realize the value of its claim is too great and the indubitable equivalence standard will not be met.

## B. Analysis

Bloomberg Law®

© 2021 The Bureau of National Affairs, Inc. All Rights Reserved. Terms of Service

// PAGE 5



In this case, the valuation evidence presented to the bankruptcy court was wide ranging. The bankruptcy court noted that the parties introduced "evidence of eleven appraisals, generated by three different appraisers and performed between July 2008 and August 2010[.]" [1] (Conf. Order at 3.) The appraisals for the fifteen unsold condominiums that were considered by the bankruptcy court were conducted between December 16, 2009 and August 12, 2010 and ranged in value from $3,450,000 to $4,540,000. ( Id. at 8.) Appraiser Hector Ingram issued two appraisals: the first valued the condominiums as of December 16, 2009 at $3,450,000 ( Id. at 3), and the second valued the condominiums as of June 30, 2010 at $3,575,000 (Appellant's Br. at 6). Appraiser Earl Worsley also valued the condominiums, first at $4,540,000 and later at $4,000,000 in a corrected appraisal. (Conf. Order at 8, 9 n.5.) Other variable factors in the appraisals included the following: the average price per square foot ranged from $250 to $325 ( id. at 13); the discount rate ranged from 12% to 15% ( id. at 8); and the entrepreneurial discount ranged from 10% to 20% ( id.).

The wide-ranging valuations presented to the bankruptcy court, even among SunTrust's own appraisers, are indicative of the uncertainty in the value of this particular property. See In re Arnold & Baker Farms, 85 F.3d at 1422 ("The large disparity in the parties' valuation of the same property illustrates the obvious uncertainty in attempting to forecast the price at which real property will sell at some uncertain future date."). This [*6] court recognizes, as did the bankruptcy court, that "valuation is not an exact science, and the chance for error always exists." (Conf. Order at 8 (quoting In re Simons, 113 B.R. 942 , 947 (Bankr. W.D. Tex. 1990)).) However, as the uncertainty of the valuation increases so does the risk of error. In the present case, the wide-ranging valuations are indicative of uncertainty and weigh against a finding of indubitable equivalence.

In addition to the fact that the valuation evidence presented to the bankruptcy court was wide ranging, the bankruptcy court made material adjustments to the appraisal evidence. The bankruptcy court took the average unit price of $370,000 from Worsley's corrected appraisal, then (1) "adjust[ed] the findings detailed in the appraisal reports to reflect the value of only the units to be surrendered by the debtor" (Conf. Order at 9); (2) excluded or discounted three of the five comparables used in the appraisal ( id. at 10-11); and (3) eliminated a discount for entrepreneurial profit ( id. at 12).

First, the bankruptcy court found it necessary to make adjustments to the appraisal evidence because the evidence presented did not reflect the value of the specific eleven condominiums to be surrendered, but instead reflected the value of all fifteen unsold condominiums. The bankruptcy court recognized the problem this presented when it stated, "The difficulty in employing any of the appraisals admitted into evidence without substantial extrapolation is that none of them offered a value on the specific units surrendered. And, unfortunately, neither did the testimony of any of the appraisers." (Conf. Order at 9.) The bankruptcy court went on to caution future litigants against offering imprecise valuation evidence: "This case offers a textbook example of the need to present, in any dirt for debt case and especially in a 'partial dirt' for debt case like this one, evidence focused on the value of the specific property to be surrendered." ( Id. at 17 (emphasis added).) Yet, while generally recognizing the problem, the bankruptcy court appears to have not taken into account, when conducting its indubitable equivalence analysis, the uncertainty this "substantial extrapolation" added to its valuation. Bannerman points out that the bankruptcy court "devotes eight pages to explaining how it methodically reached a conservative valuation of the property." (Appellee's Br. at 13 [DE #16].) However, the extensive valuation analysis undertaken by the bankruptcy court stands in stark contrast to its one paragraph indubitable equivalence analysis, in which it failed to acknowledge any uncertainty or risk that its calculation

overvalued the property. (Compare Conf. Order at 7-14, with Conf. Order at 16-17.)

Next, the bankruptcy court eliminated or discounted the three lowest ($232, $252, and $217 per square foot) of the five comparables used by Worsley and relied on the two highest comparables ($292 and $302 per square foot). (Conf. Order at 10-11; Appellant's Br. at 14-15.) The bankruptcy court determined that the appropriate price per square foot was $263 and thoroughly explained [*7] its rationale for adjusting the comparables. (Conf. Order at 10-11.) However, it is not the accuracy of the adjustment that is at issue here, it is the inherent uncertainty that adjustments generally inject into a valuation. The bankruptcy court recognized as much when it criticized Worley's adjustments to comparables 4 and 5. (See Conf. Order at 11 ("Such large adjustments invariably increase the risk of error in an appraisal valuation.").)

Finally, the bankruptcy court eliminated the discount for entrepreneurial profit. The bankruptcy court found that an entrepreneurial discount was inappropriate given that SunTrust had the option to market and offer financing on the condominiums as single units as opposed to selling them in bulk to an investor. (Conf. Order at 12-13.) At the confirmation hearing, SunTrust had not committed to a marketing plan, but the bankruptcy court found it more likely than not that the surrendered units would be sold individually. ( Id. at 12.) Based on the appraisers' testimony at the confirmation hearing with respect to entrepreneurial profit, were SunTrust to now sell the condominiums in bulk, it would most certainly be at a value less than that calculated by the bankruptcy court:

> Well, the entrepreneurial profit is the incentive to make someone come out and buy all of these units.
>
> You know, this is a three-and-a-half-million-dollar purchase. In order to encourage someone to put that kind of money down and then handle the risk of selling out the units, as we've seen through our absorption projections, it's pretty hit and miss how quickly these units sell so there is some significant risk to that. And that 15 percent [entrepreneurial discount] we make the assumption would be enough to compensate an individual to come in and buy the bulk number of units and then handle the sales process.

(Aug. 26, 2010 Conf. Hr'g at 47-48.) The complete exclusion of any entrepreneurial discount further increased the risk that SunTrust would not be fully compensated on its secured claim. See In re Arnold & Baker Farms, 85 F.3d at 1422 ("If [the creditor] subsequently sells the property for less than the value calculated by the bankruptcy court, [the creditor] has no recourse to the remaining collateral to satisfy the deficiency. As a result, the distribution to [the creditor] may not be 'completely compensatory.'").

The valuation evidence submitted to the bankruptcy court was wide ranging and each adjustment made injected further uncertainty into already tenuous valuation evidence. See In re Arnold & Baker Farms, 85 F.3d at 1422 (concluding that partial dirt for debt plan did not provide creditor with indubitable equivalent of its secured claim where the "evidence at trial demonstrated that the value of the real property was far from certain."). Furthermore, each of these adjustments served to increase the value the bankruptcy court placed on the condominiums. (See Conf. Order at 10 (adjusting average unit price upward from appraisal of $370,000 to $385,000).)

The court also finds troubling that one of the factors relied on by the bankruptcy court in support of its

indubitable [*8] equivalence determination was "the market trend evidence for the Wilmington area." ( Id. at 17.) The bankruptcy court cited the testimony from Toconis, "that there was no new construction of residential units, resulting in a shrinking inventory, and that absorption rates increased from 2009 to 2010." ( Id. at 17, n.14.) Worley, upon whose appraisal the bankruptcy court founded its valuation, conceded in response to questioning that the downtown Wilmington condominium market may have leveled off and cannot continue to drop, as suggested by Bannerman, but he concluded that the market is still "bouncing along the bottom." (Aug. 20, 2010 Conf. Hr'g Tr. at 86.) When later questioned about this assessment, Toconis agreed:

> Q: I think it was Mr. Worsley and perhaps Mr. Ingram that talked about bumping along the bottom. In your experience, Mr. Toconis, and what you see and what you do every day, are we still on the bottom?
>
> A: Yes, I believe we are still on the bottom.
>
> Q: Okay. Which way are we heading? Are we still bumping?
>
> A: I think that we are bumping, but you have to understand that Wilmington and specific New Hanover County is a very limited land mass, unlike like Raleigh here where, you know, you can just continue to grow out and out and out. Wilmington doesn't have anywhere to really grow to and the recession has caused no new construction, no new building, no new subdivision developments, no new condo projects, so we're lucky in the fact that our inventory is slowly decreasing and as that inventory decreases, home values will go back up.

(Aug. 27, 2010 Conf. Hr'g Tr. at 62.) The court views none of these statements as positing a favorable condition in the current relevant market. The fact that a bad market is not getting worse or has shown some hope of future improvement is cold comfort to a creditor being asked to forgo a portion of its security in full satisfaction of its secured claim. See In re Walat Farms, Inc., 70 B.R. 330 , 334 (E.D. Mich. 1987) ("[N]o matter how hot the market for real estate may become in the future, the market for farm real estate here and now is not such which would permit us to hold that the value of the land being offered is the indubitable equivalent of Equitable's claim.").

The bankruptcy court concluded that a $137,000 margin between its estimated value of the property to be surrendered and SunTrust's claim was sufficient to satisfy the indubitable equivalence standard. Bannerman argues that no margin of error or equity cushion is required when a bankruptcy court uses a conservative valuation. See In re Atlanta S. Bus. Park, Ltd., 173 B.R. 444 , 451 n.5 ("[I]t would be inappropriate to value conservatively the property and require the Debtor to provide a margin of error of, for example, thirty percent. Both these measures serve the same purpose of compensating a creditor for the risk it will incur upon being forced to accept the collateral in lieu of cash payments."). It is worth noting that in *Atlanta Southern Business Park* the debtor compensated the creditor with both a partial surrender of the secured creditor's collateral and cash. 173 B.R. at 451 . There is no uncertainty in the value of cash. Furthermore, the secured [*9] creditor in *Atlanta Southern Business Park* was to receive a total of $812,957.90 in real property and cash on its $663, 150.23 claim, id. at 451-52 , which actually provided a 22% equity cushion and distinguishes *Atlanta Southern Business Park* from the present case.

Most certainly, there are cases where the conservative nature or lack of uncertainty of a valuation leaves no doubt that the value of the proposed property to be surrendered is the indubitable equivalent of the creditor's secured claim. See In re May, 174 B.R. 832 , 836 & 840 (Bankr. S.D. Ga. 1994) (finding indubitable equivalence on 1.5% margin where both parties' appraisers were in "complete agreement" as to the value of the units to be surrendered). This is not such a case. The $137,000 (less than 3%) margin of error here is far too slim given (1) the wide-ranging valuation evidence; (2) the "substantial extrapolation" the bankruptcy court found necessary in order to value the condominiums; and (3) the unfavorable conditions of the relevant market. It is worth repeating that "indubitable" means "not open to question or doubt." In the present case, the court is left with substantial doubt that the value of the proposed property to be surrendered is the indubitable equivalent of SunTrust's secured claim.

**CONCLUSION**

For the foregoing reasons, the bankruptcy court's order confirming the Debtor's Chapter 11 plan is VACATED and the case is REMANDED to the bankruptcy court for further proceedings consistent with this order. Debtor's motion for oral argument [DE #18] is DENIED. The clerk is directed to close this case.

This 30th day of September, 2011.

/s/ Malcolm J. Howard

MALCOLM J. HOWARD

Senior United States District Judge

At Greenville, NC

---

fn 1

The appraisals submitted with respect to the condominiums were commissioned by SunTrust. (Conf. Order at 3.) SunTrust contends that the bankruptcy court overstated the number of appraisals and that there were actually three appraisals of the condominiums plus revisions. At the confirmation hearing, testimony on valuation was presented by three appraisers and Bannerman's member-manager, Todd Toconis.